IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ROMARIS WALTON, #B69607,** )<br>)<br>**Plaintiff,** )<br>)<br>vs. )<br>)<br>**DEANNA BROOKHART,** )<br>**LT. LIVINGSTON,** )<br>**MS. ELLIOT,** )<br>**LORIE CUNNINGHAM, and** )<br>**JOHN DOE C/O,** )<br>)<br>**Defendants.** ) | Case No. 3:22-cv-02908-MAB |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Romaris Walton is an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Sheridan Correctional Center. He brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights during his confinement at Lawrence Correctional Center ("Lawrence"), including retaliation and exposure to COVID-19 (Doc. 1). The Court dismissed the original Complaint without prejudice for failure to state a claim upon which relief may be granted (Doc. 9).

Plaintiff's First Amended Complaint (Doc. 10) is now before the Court for preliminary review under 28 U.S.C. § 1915A, which requires the Court to screen prisoner Complaints to filter out non-meritorious claims. 28 U.S.C. § 1915A(a). Any portion of a Complaint that is legally frivolous, malicious, fails to state a claim for relief, or requests money damages from an immune defendant must be dismissed. 28 U.S.C. § 1915A(b).

1

## THE FIRST AMENDED COMPLAINT

The amended pleading presents the following allegations: In November 2020, Plaintiff was housed with a cellmate in cell 1C-U19 at Lawrence. Both were tested for COVID-19 on November 23, 2020. When the results came back the next day (November 24, 2020), Plaintiff tested negative, but his cellmate was positive (Doc. 10, p. 13). The cellmate was moved that day, leaving Plaintiff in the cell alone.

The next day (November 25, 2020), Defendant Elliot (Placement Officer) moved Plaintiff to Cell 6C-L3, exposing him to the hazard of being housed with other infected or potentially infected inmates (Doc. 10, p. 13). As he left cell 1C-U19, Plaintiff observed that the neighboring cell (1C-U18) had a quarantine sign on the door. That inmate, an older Black man, was allowed to remain on the 1C wing. Plaintiff questions why that inmate was allowed to remain on the 1C wing without a cellmate, under quarantine, while Plaintiff (also an older Black man[1]) was moved (Doc. 10, p. 15). Plaintiff believes he was moved in retaliation for grievances he had previously filed against Defendants Brookhart, Livingston, Elliot, and Cunningham. *Id.*

When Plaintiff arrived at the new cell (6C-L3) on November 25, 2020, the John Doe C/O (1st shift) and Defendant Livingston[2] (2nd shift) threatened Plaintiff with a ticket and segregation if he didn't move into this cell with a cellmate (Doc. 10, p. 13). Neither of these Defendants was wearing PPE (personal protective equipment) gear. Both

---

[1] According to Plaintiff's profile on the IDOC inmate search website, he is now 49 years old, and would have been age 46 in November 2020. Https://idoc.illinois.gov/offender/ inmatesearch.html (last visited Sept. 25, 2023).
[2] Before this interaction, Plaintiff had filed a grievance against Defendant Livingston for his failure to wear a mask on November 14, 2020 (Doc. 10, pp. 24-28).

Defendants disregarded Plaintiff's explanation that he did not want to share a cell because he faced an elevated mortality risk if he were to contract COVID-19 on account of his race, age, and hypertension condition. Plaintiff followed the John Doe C/O's order to lock up in the cell on first shift. The new cellmate had also been in a different cell house with a cellmate who had tested positive for COVID-19 before his placement in cell 6C-L3, so this new cellmate was "suspected" to be infected.[3] During second shift, Plaintiff moved his property out of the cell and explained his concerns to Defendant Livingston, who threatened Plaintiff with discipline. When Plaintiff declared a hunger strike, he was placed in an open cell on the 6C wing (cell 6C-L9) (Doc. 10, pp. 12-13).

On November 30, 2020, Plaintiff tested positive for COVID-19 (Doc. 10, p. 12). The next day (December 1, 2020), Plaintiff was moved to cell 8C-U1 with a White cellmate who had also tested positive. *Id.* Plaintiff's cellmate complained, and as a result, Plaintiff was moved to yet another cell (8C-U5, with a Black cellmate) while the White inmate was allowed to remain alone in cell 8C-U1. Plaintiff states that this move was in retaliation for a grievance he filed on December 1, 2020 (No. 12-20-074) (Doc. 10, p. 12). Defendant Elliot signed off on all the cell moves. At an unspecified later date, Plaintiff was moved again, to cell 8C-U19. *Id.*

Defendant Brookhart[4] signed off on Plaintiff's grievances against Elliot and Livingston filed prior to November 25, 2020, making her aware of their alleged misconduct (Doc. 10, p. 13). Defendant Cunningham is responsible for inmates' safety

---

[3] Plaintiff's grievance notes that this new cellmate had tested negative for COVID-19 (Doc. 10, p. 11).
[4] Plaintiff sued Defendant Brookhart in *Walton v. Ray, et al.*, Case No. 19-cv-00804-MAB, filed in July 2019 (Doc. 10, p. 13). That case was settled and closed in 2023.

and "was obligated to check the health status" of all inmates infected with COVID-19 (Doc. 10, p. 14). Defendant Livingston could have caused COVID-19 to come into Plaintiff's original cell house, because on November 14, 2020, Plaintiff observed Livingston shaking down an inmate while his face mask was below his chin. *Id.* Plaintiff filed Grievance No. 11-20-151 against Livingston over that incident. *Id.*

After Plaintiff was diagnosed with COVID-19, he suffered neurological sluggishness, difficulty breathing, headaches, muscle aches, loss of taste and smell, as well as psychological distress due to his fear of death from the infection. He continues to suffer from unspecified long haul symptoms (Doc. 10, p. 14).

Plaintiff seeks monetary damages (Doc. 10, p. 17).

## DISCUSSION

Based on the allegations in the First Amended Complaint, the Court designates the following claims in this *pro se* action:

> **Count 1:** Eighth Amendment deliberate indifference to serious medical needs claim against all Defendants for failing to protect Plaintiff from infection with COVID-19.
>
> **Count 2:** First Amendment retaliation claim against Defendants for moving Plaintiff from cell 1C-U19 to cells in 6C-wing cellhouse because Plaintiff had filed grievances against them.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly* pleading**

4

**standard**.[5]

### Count 1

The Court dismissed this claim without prejudice after concluding that the original Complaint failed to state a claim upon which relief may be granted against any Defendant[6] (Doc. 9, pp. 4-7). The First Amended Complaint likewise fails to state a viable Eighth Amendment claim.

Prison officials may violate the Eighth Amendment when they subject an inmate to prison conditions that deny the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective conditions must have resulted in an unquestioned and serious deprivation of basic human needs such as food, medical care,[7] sanitation, or physical safety. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). There is also a second, subjective element to an Eighth Amendment claim – establishing a defendant's culpable state of mind, which is deliberate indifference to a substantial risk of serious harm to the inmate from those conditions. *Farmer*, 511 U.S. at 837, 842. The deliberate indifference standard is satisfied if the plaintiff shows that the prison official acted or failed to act despite the official's knowledge of a substantial risk of serious harm from the conditions. *Farmer*, 511 U.S. at 842. It is well settled that mere negligence is not enough. *See, e.g.*,

---

[5] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face.").

[6] The original Complaint included Defendants Brookhart, Livingston, and Elliot, but did not include Cunningham or the John Doe C/O as Defendants.

[7] Plaintiff does not raise any claim related to his medical treatment or lack thereof after he contracted COVID-19.

*Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

Certainly, Plaintiff, his fellow inmates, as well as prison staff, all faced a risk of infection with COVID-19 during the worldwide pandemic in 2020, which amounts to a substantial risk of serious harm. It is obvious from Plaintiff's narrative that prison officials were aware of this health risk, because they implemented quarantine policies as well as requirements for staff to wear PPE in order to mitigate the risk of spreading the disease. Thus, the Defendants who adopted these policies (presumably Warden Brookhart and possibly Health Care Administrator Cunningham) appear to have responded reasonably to the risk. Despite Plaintiff's opinion that Defendants did not follow logical quarantine procedures or make sensible cell placement decisions, this policy response is enough to avoid liability under the deliberate indifference standard. *See Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("prison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted") (citing *Farmer*, 511 U.S. at 847; *Soto v. Johansen*, 137 F.3d 980, 981 (7th Cir. 1998)).

Plaintiff complains that Defendants Livingston and John Doe C/O failed to comply with the prison's PPE requirements by not wearing face masks properly. He also takes issue with his transfer to several cells in the 6C wing as contrary to quarantine guidelines. The failure to follow government-agency health guidelines such as those informing the prison's PPE and quarantine rules does not rise to the level of a constitutional violation. *See Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020) ("CDC Guidelines – like other administrative guidance – do not themselves set a constitutional

standard."). "[W]hile the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Id.* Likewise, violations of state laws or prison policies do not amount to a violation of the Constitution under § 1983. *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (a violation of jail policy is not cognizable under § 1983); *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (§ 1983 does not protect plaintiffs from violations of state law or policy). Accordingly, Defendant Livingston's failure to follow prison policies on the use of PPE, which gave rise to Plaintiff's November 14, 2020 Grievance No. 11-20-151, and the John Doe C/O's lack of PPE, did not violate Plaintiff's Eighth Amendment rights.

Plaintiff alleges that Defendant Elliot, as placement officer, ordered or approved his transfer to the various cells in 6C-wing after his cellmate in 1C-U19 tested positive for COVID-19. However, those cell moves do not indicate that Elliot was deliberately indifferent to Plaintiff's risk of COVID-19 infection. Instead, the moves suggest an effort to separate COVID-positive inmates from those who had tested negative, in an attempt (ultimately unsuccessful) to contain the spread of the virus.

Plaintiff's first move, on November 25, 2020, was to cell 6C-L3, to be housed with a cellmate who also tested negative but had been in a cell with someone who tested positive for COVID-19 (Doc. 10, p. 11). Plaintiff's situation was identical – he tested negative for COVID-19 when his cellmate tested positive on November 24, 2020. This placement does not amount to deliberate indifference to a known risk of harm; both Plaintiff and his new cellmate had previous exposure from a cellmate but tested negative

7

for the virus. Plaintiff was exposed to his COVID-19-positive cellmate on November 23-24, 2020, before his move to 6C-wing. By Plaintiff's own description, he remained in cell 6C-L3 with the new cellmate for only part of a day before he was placed by himself in cell 6C-L9 on November 25, 2020.

Plaintiff tested positive for COVID-19 on November 30, 2020, six days after learning that his first cellmate tested positive for the virus. It cannot be known whether Plaintiff contracted COVID-19 from that first exposure in 1C-U19, or from an exposure in 6C-wing. But according to information from the Centers for Disease Control ("CDC"), the incubation period from initial exposure to COVID-19 to the onset of symptoms ranges from two to 14 days, with a median incubation period of five days. Https://wwwnc.cdc.gov/travel/yellowbook/2024/infections-diseases/covid-19#transmission (last visited October 4, 2023).[8] Given this incubation period, the odds are significant that Plaintiff got the disease from his COVID-positive cellmate in 1C-U19, before Elliot moved him to wing 6C with a cellmate who was negative at the time.

Plaintiff's interactions with Defendants John Doe C/O and Livingston, both of whom ordered him to lock up in cell 6C-L3 with the new COVID-negative cellmate, do not support a deliberate indifference claim against these Defendants. If they were aware

---

[8] *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994); *Bova v. U.S. Bank, N.A.*, 446 F. Supp. 2d 926, 930 n.2 (S.D. Ill. 2006) (a court may judicially notice public records available on government websites) (collecting cases). The CDC notes that the incubation period is much shorter (3-5 days) for the Omicron variant of COVID-19 – but Omicron was not confirmed in the United States until December 2021, more than a year after Plaintiff contracted COVID-19.
Https://wwwnc.cdc.gov/travel/yellowbook/2024/infections-diseases/covid-19#transmission; https://www.cdc.gov/media/releases/2021/s1201-omicron-variant.html (last visited Oct. 4, 2023).

of the COVID-19-negative status of Plaintiff and the new cellmate, placing the two inmates together did not present an obvious risk to Plaintiff's health.

Finally, Plaintiff does not set forth any factual allegations supporting a deliberate indifference claim against Defendants Cunningham or Brookhart. The general claim that Cunningham should have examined him after he became ill is not sufficient; Plaintiff does not allege that he submitted any requests for medical care, let alone that such requests failed to yield an appropriate response. As to Brookhart, her role in signing off on Plaintiff's grievances does not amount to deliberate indifference to Plaintiff's risk of contracting COVID-19. Those grievances were filed on December 1 and December 20, 2020, after Plaintiff tested positive, thus Brookhart had no power as of those dates to prevent the harm that had already occurred. (Doc. 10, pp. 9-13, 18-22). Further, Brookhart's role in responding to Plaintiff's grievances does not amount to the "personal involvement" necessary to hold her liable for the underlying alleged unconstitutional conduct. *See Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011).

Like Plaintiff's original pleading, the First Amended Complaint does not demonstrate that any Defendant acted with the requisite culpable state of mind – *i.e.*, deliberate indifference to a substantial risk of serious harm to Plaintiff. Plaintiff's narrative does not indicate that a deliberately indifferent action of any individual Defendant caused him to contract COVID-19. Count 1 will again be dismissed against all Defendants.

## Count 2

This retaliation claim was also dismissed without prejudice because in the original

Complaint, Plaintiff did not identify which individual moved him to a different cell in retaliation for his grievances over prison staff who failed to follow PPE protocols, or indicate which grievances may have triggered the alleged retaliation (Doc. 9, pp. 7-8). The First Amended Complaint also fails to state a viable retaliation claim.

Prison officials may not retaliate against inmates for filing grievances, lawsuits, or otherwise complaining about their conditions of confinement. *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002). The issue in a retaliation claim is whether the plaintiff experienced an adverse action that would likely deter First Amendment activity in the future, and if the First Amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action. *See McKinley v. Schoenbeck*, 731 F. App'x 511, 515 (7th Cir. 2018) (quoting *Surita v. Hyde*, 665 F.3d 860, 878-79 (7th Cir. 2011)); *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009). "A complaint states a claim for retaliation when it sets forth 'a chronology of events from which retaliation may plausibly be inferred.'" *Zimmerman v. Tribble*, 226 F.3d 568, 573 (7th Cir. 2000) (citation omitted).

Plaintiff provided information on only one grievance he filed before his November 25, 2020 cell move – against Defendant Livingston on November 14, 2020, for not wearing his mask properly. He does not allege that Livingston decided to move him from 1C-wing to 6C-wing; instead, Plaintiff states that Defendant Elliot made or approved that decision. This sequence of events does not plausibly suggest that Elliot moved Plaintiff because he had complained about Livingston. Further, Plaintiff does not claim to have filed grievances against Elliot that might have prompted a retaliatory cell move on

10

November 25, 2020. He points to his December 1, 2020 grievance (No. 12-20-074) as the motivation for the alleged retaliation (Doc. 10, p. 15). However, Plaintiff filed that grievance *after* he was moved to 6C-wing, including the moves to cell 6C-L3 with a new cellmate and to cell 6C-L9 by himself (Doc. 10, p. 11).[9] Obviously, that grievance could not have been the reason for Elliot to move Plaintiff from his 1C-wing cell to the other cells on November 25, 2020. Instead, as noted in the discussion of Count 1, it is more plausible that Plaintiff was reassigned to the other cells as part of the unsuccessful attempt to contain the spread of COVID-19.

The First Amended Complaint does not set forth a sequence of events that would plausibly suggest any other Defendant participated in the decision to move Plaintiff or did so in order to retaliate against him for filing grievances or complaints. Accordingly, Count 2 will again be dismissed.

Plaintiff has now had two opportunities to articulate viable constitutional claims relating to his COVID-19 infection and alleged retaliation. The Order dismissing the original Complaint explained the legal standards and the reasons why Plaintiff failed to state viable claims (Doc. 9). The First Amended Complaint set forth the factual basis for Plaintiff's claims in detail and included copies of the grievances he deemed to be relevant, yet this pleading again failed to survive merits review pursuant to 28 U.S.C. § 1915A. The Court concludes that allowing Plaintiff to file yet another amended complaint in an attempt to restate his claims would be futile. Leave to amend need not be granted under

---

[9] The later cell moves all occurred after Plaintiff was diagnosed with COVID-19, thus did not create any further risk to him.

these circumstances. *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 707 (7th Cir. 2021); *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013). The First Amended Complaint and this entire action will therefore be dismissed with prejudice and without leave to amend.

## DISPOSITION

The First Amended Complaint (Doc. 10) and this action are **DISMISSED with prejudice** for failure to state a claim upon which relief may be granted. All pending motions are **DENIED AS MOOT**. The Clerk is **DIRECTED** to **CLOSE THIS CASE** and enter judgment accordingly. The Court counts this dismissal for failure to state a claim as one of Plaintiff's three allotted "strikes" under the provisions of 28 U.S.C. § 1915(g).

If Plaintiff wishes to appeal this dismissal, his notice of appeal must be filed with this Court within thirty days of the entry of judgment. FED. R. APP. P. 4(a)(1)(A). A proper and timely motion filed pursuant to Federal Rule of Civil Procedure 59(e) may toll the 30-day appeal deadline. FED. R. APP. P. 4(a)(4). A Rule 59(e) motion must be filed no more than twenty-eight (28) days after the entry of the judgment, and this 28-day deadline cannot be extended.

A motion for leave to appeal *in forma pauperis* must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee irrespective of the outcome of the appeal. *See* FED. R. APP. P. 3(e); 28 U.S.C. § 1915(e)(2); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza*, 181 F.3d 857, 858-59 (7th Cir. 1999); *Lucien v. Jockisch*, 133 F.3d 464, 467 (7th Cir. 1998). Moreover, if the appeal is found to be

nonmeritorious, Plaintiff may also incur another "strike."

**IT IS SO ORDERED.**

**DATED: October 5, 2023**

/s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**